UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: METOPROLOL SUCCINATE END-PAYOR ANTITRUST LITIGATION | Civil Action No. 06-cv-71 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**DECLARATION OF SHANNON R. WHEATMAN, PH.D.
ON IMPLEMENTATION AND ADEQUACY OF NOTICE PLAN**

I, Shannon R. Wheatman, declare as follows:

1. My name is Shannon Wheatman. I am over the age of twenty-one (21) years, have never been convicted of a felony, and am fully competent to make this declaration. I am a Senior Vice President of Kinsella Media, LLC ("KM"), an advertising and notification firm in Washington, D.C. specializing in the design and implementation of class action and bankruptcy notification programs. My business address is 2120 L Street NW, Suite 860, Washington, D.C. 20037. My telephone number is (202) 686-4111. The facts in this declaration are true and correct and based on my personal knowledge.

2. I was asked by Class Counsel in this action to design the Notices and Notice Plan to inform Class Members about their rights in the litigation. The Court approved the Notices and Notice Plan that was set forth in more detail in the "Declaration of Shannon R. Wheatman, Ph.D., on Adequacy of Notice Plan" dated September 25, 2012, and the accompanying exhibits. In that Declaration and my attached C.V., I detailed my class action notice experience and my publications on class action notice and due process. I also provided my educational and professional experience relating to notice of class actions and my qualifications to render opinions on the overall adequacy of notice programs.

3. This report will detail all of the notice activities that were undertaken, provide "proofs of performance," and explain how and why the Notice Plan was adequate to satisfy due process requirements.

**SUMMARY OF CONCLUSIONS**

4. The Court-approved Notice Program, designed and implemented for this case, achieved each of the planned objectives:

    a. Each element of the Notice Program approved by the Court has been implemented.

    b. The Notice Program, as implemented, reached over 80% of potential Class Members through paid media.

    c. The Court-approved Notices were noticeable, clear, simple, substantive, and informative. No significant or required information was missing.

5. In my view, the Notice Program provided the best notice practicable under the circumstances of this case, and satisfied due process.

6. The details of the Notice Plan and the basis for my opinion on its adequacy, as well as on the adequacy of the Notice Plan as implemented, are outlined below.

*Individual Notice*

7. On November 8, 2012, the Postcard Notice was sent to approximately 40,477 TPP mailing addresses. There are 2,223 notices or 5.5% that remain undelivered.

*Publication Notice*

8. To reach TPP Class Members who did not receive a Postcard Notice, a Summary Notice appeared as follows: one time in *HR Magazine* and one time in *National Underwriter: Life & Health*.

9. To reach Consumer Class Members, a notice program utilizing national consumer magazines, a widely distributed newspaper supplement, local newspapers in U.S. territories and possessions, and Internet ad networks was implemented.

10. The Consumer Publication Notice appeared in consumer magazines as follows: two times in *Newsweek*, one time in *AARP Bulletin*, one time in *Ebony*, one time in *National Geographic*, one time in *Reader's Digest*, one time in *Southern Living*, one time in *TV Guide*, and one time in *Woman's Day*.

11. The Consumer Publication Notice appeared in the newspaper supplement, *Relish*.

12. The Consumer Publication Notice appeared one time in each of the following U.S. territory newspapers (translated into Spanish as necessary): *Samoa News* (American Samoa), *Pacific Daily News* (Guam), *Saipan Tribune* (Northern Mariana Islands), *El Nuevo Dia* (Puerto Rico), *Primera Hora* (Puerto Rico), *St. Croix Avis* (St. Croix, U.S.V.I.), and *Virgin Islands Daily News* (St. Thomas, U.S.V.I).

13. Internet banner advertising appeared from November 8, 2012 to December 7, 2012 across the following online networks and websites: 24/7 Real Media Network, Quadrant One network, and RMM Network.

14. Additional banner advertising appeared on SouthernLivingMarket.com from December 1 to December 31 as a bonus to publishing in Southern Living Magazine.

15. An Implementation Report for the Notice Program is attached as **Exhibit 1** and confirms that the Court-approved Notice Program was implemented. The report details each print publication and the date and page number upon which the Publication Notice appeared. A true and correct copy of the TPP Publication Notice and Consumer Publication Notice, or "tearsheet," as it appeared in print is attached as **Exhibit 2**. Also included is the banner ad as it appeared on several websites.

16. For the purpose of evaluating the strength and efficiency of the media, the national newspaper supplements, national consumer magazines and Internet[1] were measured against the target audience to establish the estimated *reach*[2] of the media program and the estimated

---

[1] MRI does not measure the U.S. territories and possessions newspapers or the trade publications. Therefore, their contribution to the overall reach of the media is not calculated.
[2] Reach is the estimated percentage of a target audience reached through a specific media vehicle or combination of media vehicles.

*frequency*[3] of exposure to the media vehicles. An estimated 80% of High Blood Pressure Medication Users were reached with an average estimated frequency of 2.2 times.

### *Earned Media*

17. An earned media program was implemented to amplify the paid media program and provide additional notice to Class Members. The press release provided information about the Settlement and highlighted the toll-free telephone number and website address so that Settlement Class Members could obtain complete information.

18. On November 8, 2012, a press release was distributed on PR Newswire's Full National Circuit, reaching approximately 5,000 media outlets and 5,400 websites.

### *Online Media*

19. On November 7, 2012, the neutral website (www.ToprolSettlement.com) went live. By accessing the website, Class Members could obtain additional information and documents about the Settlement including the Long Form Notices, Court documents, Frequently Asked Questions, and other information. The website address was prominently included in all Notice materials. As of February 27, 2013, there have been 122,743 unique visits to the website.

### *Other*

20. On November 7, 2012, a toll-free phone number was established allowing Class Members to call and request that a Notice be mailed to them or listen to frequently asked questions. As of February 27, 2013, there have been 21,908 calls to the toll free number.

21. A post office box was established allowing Class Members to contact Class Counsel by mail with any specific requests or questions.

---

[3] Frequency is the estimated average number of opportunities an audience member has to see the notice.

## PERFORMANCE AND DESIGN OF NOTICE PROGRAM

22. ***Objectives were met.***  The primary objective of the Settlement Notice effort in this case was to effectively reach the greatest practicable number of Class Members with a "noticeable" Notice of the Settlement, and provide Class Members with every reasonable opportunity to understand that their legal rights are affected, and that they have a right to be heard and to object to and request exclusion from the settlement.  This objective was met.

23. ***The Notice reached Class Members effectively.***  Our calculations indicate that individual notice in combination with the supplemental media program reached over 80% of potential Class Members.  In addition, although not included in the reach percentage above, the Settlement website further enhanced coverage among the Class.  In my experience, this reach meets that achieved in many other court-approved notice programs.  Based on our calculations, I can confidently state that the Class was adequately reached with notice of the Settlement.

24. ***Plenty of time and opportunity to react to the Notice.***  The final appearance of the Publication Notice was on December 5, 2012, which allowed plenty of time for Class Members to see the Notice and respond accordingly before the January 18, 2013 exclusion and objection deadlines.  With 44 days from the last Notice appearance until the exclusion and objection deadlines and 92 days until the fairness hearing, Class Members were allotted more than adequate time to act on their rights.

25. ***Notices were designed to increase noticeability and comprehension.***  The Court-approved Notices were designed to bring the Notices to the attention of Class Members.  Because recipients of mail are accustomed to receiving junk mail that they may be inclined to discard unopened, the notices were designed to bring the Notices to the attention of Class Members by, for example, including bold and informative headlines.  Once people "noticed" the Notices, it was critical that they could understand the contents of the notice.

26. The Postcard Notice was worded with simple, plain language text to encourage readership and comprehension. It also directed readers to the case website and the toll-free number for more information.

27. The Consumer Notices were drafted in plain easy to understand language with the intent to be inclusive, not exclusive, of consumer claims.

28. The Publication Notices were designed to get the reader's attention. No important or required information was missing or omitted. The Notices referred readers to the case website and the toll-free number for more information.

29. The Long Form Notices were available via the website or toll-free number established by the Claims Administrator. The Long Form Notices included a large, bold headline that captured attention and immediately alerted even casual readers that they should read the Notice and explained why it is important.

30. The Long Form Notices contained a prominent focus on the options that Class Members have, using a straightforward table design, and included details about the Settlement, such as who is affected, and Class Members' rights. The Long Forms were written in a question and answer format that made it easy to find answers to common questions.

## CONCLUSION

31. Notice of the Settlement in this case reached 80% of Class Members. Many courts have determined that a 75 or 80 percent "reach" is more than adequate in analogous cases. This "reach" indicates that the notice campaign was highly successful in providing notice to potential Class Members.

32. In addition, although not included in the reach percentage above, the website provided information about the Settlement to Class Members.

33. The Court-approved notice program also comports with the guidance for effective notice articulated in the latest edition of the *Manual for Complex Litigation, Fourth*.

I declare under penalty of perjury and the laws of the United States and the District of Columbia that the foregoing is true and correct and that this declaration was executed on March 1, 2013, in Washington, D.C.

_Shan Wh_

Dr. Shannon R. Wheatman

# EXHIBIT 1

# Notice Program Implementation Report
*In re: Metoprolol Succinate End-Payor Antitrust Litigation*



## Paid Media Components

| Print Media | Unit Type/Size | Date Ad(s) Ran | Page # of Ad | Tearsheet Received? |
|---|---|---|---|---|
| **Magazine(s)** | | | | |
| *AARP Bulletin* | 1/3 Page (3.0" x 10.56") | 12/2/2012 | 10 | Yes |
| *Ebony* | Half Page (3.5625" x 10") | 11/20/2012 | 145 | Yes |
| *HR Magazine* | Half Page (7.25" x 4.875") | 12/3/2012 | 82 | Yes |
| *National Geographic* | Full Page (5.75" x 9") | 11/27/2012 | 145 | Yes |
| *National Underwriter: Life & Health* | Half Page (7.125" x 4.875") | 12/3/2012 | 20 | Yes |
| *Newsweek* | Half Page (3.375" x 10") | 11/19/2012 | 60 | Yes |
| *Newsweek* | Half Page (3.375" x 10") | 12/3/2012 | 55 | Yes |
| *Reader's Digest* | Full Page (4.687" x 6.75") | 11/13/2012 | 202 | Yes |
| *Southern Living* | Half Page (3.5" x 10") | 11/16/2012 | 26 | Yes |
| *TV Guide* | Half Page (3.5625" x 10") | 11/29/2012 | 27 | Yes |
| *Woman's Day* | Half Page (3.5" x 10") | 11/13/2012 | 90 | Yes |
| **Newspaper(s)** | | | | |
| *El Nuevo Dia* | 10.87" x 6" | 11/25/2012 | 68 | Yes |
| *Pacific Daily News (Guam)* | 5.83" x 10" | 11/25/2012 | 18 | Yes |
| *Primera Hora* | 10.87" x 4" | 11/29/2012 | 28 | Yes |
| *Saipan Tribune* | 7.25" x 10.125" | 11/30/2012 | 24 | Yes |
| *Samoa News* | 6" x 10" | 11/26/2012 | 3 | Yes |
| *St. Croix Avis* | 6" x 10" | 11/28/2012 | 14 | Yes |
| *Virgin Islands Daily News* | 6.08" x 9" | 12/1/2012 | 12 | Yes |
| **Newspaper Supplement(s)** | | | | |
| *Relish* | 2/5 Page (4.75" x 6.625") | 12/5/2012 | 16 | Yes |

| Online Media | Ad Type/Size | Estimated Impressions | | Ads Ran? |
|---|---|---|---|---|
| **Web** | | | | |
| *24/7 Network* | 728x90, 300x250, 160x600 | 70,893,000 | | Confirmed |
| *Quadrant One* | 728x90, 300x250, 160x600 | 4,865,000 | | Confirmed |
| *RMM Network* | 728x90, 300x250 & 160x600 | 29,031,000 | | Confirmed |

# EXHIBIT 2

designed to prevent or decrease tobacco use would be 50 percent, officials said.

To qualify as nondiscriminatory, a program would have to provide reasonable alternative standards for individuals with personal physicians who stated that the usual standards were inappropriate for those individuals.

"Plans and issuers may impose standard cost sharing under the plan or coverage for medical items and services furnished in accordance with the physician's recommendation," officials said in the preamble.

Plans could still use old interpretations that let them target initiatives, such as initiatives aimed at workers with high blood cholesterol workers, officials said.

The departments are asking for comments on "ways to ensure that employees will not be subjected to an unreasonable 'one-size-fits-all' approach to designing the different means of qualifying for the reward," officials said.

In the EHB proposals, officials talk at length about proposals for "habilitative" services, or services such as speech therapy and occupational therapy. Many insurers have covered those types of therapy in the form of rehabilitative services for individuals who have suffered disabling illnesses and accidents, but many have not covered those types of services as "habilitative" services, or services designed for people who were born without the ability to perform some or many normal functions.

Parent of children who are dealing with autism and other challenging conditions succeeded in getting Congress to include habilitative services into the PPACA EHB package. Many states have noted that they have not traditionally required insurers to cover habilitative services and are not sure how to handle those requirements.

HHS officials said they intend to propose a "transitional policy for coverage of habilitative services that would provide states with the opportunity to define these benefits if not included in the base-benchmark plan."

HHS has asked states to pick a solid but affordable health plan to serve as a "benchmark" plan, or model for the EHB package.

"If the usual base benchmark plan a state picked was not providing coverage of habilitative services, the state may determine the services included in the habilitative services category," HHS officials said. "We believe that this transitional policy—which provides states with additional flexibility beyond what was initially outlined in [an earlier HHS] EHB Bulletin will provide a valuable opportunity for states to lead the development of policy in this area...."

If a state doesn't come up a definition of the habilitative services that the EHB should include, then a plan in the state must either report to HHS on its habilitative services coverage rules or else provide parity between habilitative services and rehabilitative services coverage.

---

Legal Notice

## Third Party Payors That Paid for the Heart Medication, Toprol XL® or its Generic
### Could Get Money from a Class Action Settlement

A Settlement has been reached in a class action lawsuit involving the heart medication, Toprol XL® and its generic equivalent, metoprolol succinate. AstraZeneca AB, AstraZeneca LP, AstraZeneca Pharmaceuticals LP, and Aktiebolaget Hassle (the "Defendants") will pay up to $11 million. After payment of fees and expenses, approximately 50% of the net fund will be paid to consumers, and approximately 50% will be paid to insurers and employee welfare benefit plans.

The lawsuit claims that the Defendants violated antitrust and consumer protection laws by keeping lower cost generic versions of Toprol XL® off the market. The Defendants deny this. **No one is claiming that Toprol XL® or its generic are unsafe or ineffective.**

#### Who's Included?

Generally, insurers and employee welfare benefit plans are included if they purchased, paid for and/or reimbursed others for Toprol XL® or its generic equivalent at any time from May 5, 2005 through September 27, 2012. Purchases made directly from the Defendants are not included under the Settlement.

#### What Can You Get?

Payments will be based on the valid claims filed (that is, how much your company and others paid for Toprol XL® or its generic and when you paid for it). More details are available in the Plan of Allocation, which will be available at www.ToprolSettlement.com or by calling 1-877-854-3273.

#### How to Get a Payment?

TPPs must submit an online Claim Form to get a payment. The Claim Form, and instructions on how to submit it, are available at www.ToprolSettlement.com. The deadline to submit a Claim Form is **April 1, 2013**.

#### Your Other Rights.

If TPPs do nothing, their rights will be affected. TPPs that do not want to be legally bound by the Settlement, must exclude themselves from the Settlement by **January 18, 2013**. If a TPP does not exclude itself it will not be able to sue the Defendants for any claim relating to the lawsuit. If a TPP stays in the Settlement, it may object to the Settlement by **January 18, 2013**.

The Court will hold a hearing on **March 7, 2013** to consider whether to approve the Settlement and a request for attorneys' fees up to $3.5 million, reimbursement of costs, and incentive awards. You can appear at the hearing, but you don't have to. You can hire your own attorney, at your own expense, to appear or speak for you at the hearing.

**For complete information and a Claim Form: Visit: www.ToprolSettlement.com   Call: 1-877-854-3273**

Case 1:06-cv-00071-GMS-MPT   Document



DECEMBER 2012

NAT GEOG



POSTER

# THE WORLD'S LARGEST TREES

*The President*
GIANT SEQUOIA
SEQUOIA NATIONAL PARK
CALIFORNIA

The Tunnels of Gaza 42
Finding Every Bird of Paradise 70
Fracking for Methane 90
A Spirited Revival for Shamans 110
The Lost World of Doggerland 132

Legal Notice

# If You Paid for the Heart Medication, Toprol XL® or its Generic

## You Could Get Money from a Class Action Settlement

A Settlement has been reached in a class action lawsuit involving the heart medication, Toprol XL® and its generic equivalent, metoprolol succinate. AstraZeneca AB, AstraZeneca LP, AstraZeneca Pharmaceuticals LP, and Aktiebolaget Hassle (the "Defendants") will pay up to $11 million. After payment of fees and expenses, approximately 50% of the net fund will be paid to consumers, and approximately 50% will be paid to insurers and employee welfare benefit plans.

The lawsuit claims that the Defendants violated antitrust and consumer protection laws by keeping lower cost generic versions of Toprol XL® off the market. The Defendants deny this. **No one is claiming that Toprol XL® or its generic are unsafe or ineffective.**

### Who's Included?

Generally, you are included if you purchased, paid for and/or reimbursed others for Toprol XL® or its generic equivalent at any time from May 5, 2005 through September 27, 2012. Purchases made directly from the Defendants are not included under the Settlement.

### What Can You Get?

Payments will be based on the valid claims filed (that is, how much you and others paid for Toprol XL® or its generic and when you paid for it). More details are available in the Plan of Allocation, which will be available at www.ToprolSettlement.com or by calling 1-877-854-3273.

### How to Get a Payment?

You must submit a Claim Form to get a payment. The Claim Form, and instructions on how to submit it, are available at www.ToprolSettlement.com or by calling 1-877-854-3273. The deadline to submit a Claim Form is **April 1, 2013**.

### Your Other Rights.

If you do nothing, your rights will be affected. If you do not want to be legally bound by the Settlement, you must exclude yourself from the Settlement by **January 18, 2013**. If you do not exclude yourself you will not be able to sue the Defendants for any claim relating to the lawsuit. If you stay in the Settlement, you may object to it by **January 18, 2013**.

The Court will hold a hearing on **March 7, 2013** to consider whether to approve the Settlement and a request for attorneys' fees up to $3.5 million, reimbursement of costs, and incentive awards. You can appear at the hearing, but you don't have to. You can hire your own attorney, at your own expense, to appear or speak for you at the hearing.

**For complete information and a Claim Form:**
Visit: www.ToprolSettlement.com    Call: 1-877-854-3273

Site: Los Angeles Times
Placement: Run of Network
Ad Unit: 300x250






dailystrength.com



# Legal Notice Class Action-Beta Blocker





topix.com